UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br>  v.<br>RICKY NORMAN ROLLINS,<br>    Defendant. | No. CR 24-00064 WHA<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## INTRODUCTION

In this 18 U.S.C. § 922(g)(1) prosecution, defendant moves to suppress evidence obtained by police after they frisked him during the execution of a search warrant. For the reasons stated below, the suppression motion is **DENIED**.

## FINDINGS OF FACT

In the wee hours of November 8, 2023, SFPD officers executed a search warrant on the apartment where defendant Ricky Rollins's grandmother and cousin George Washington lived. The warrant, issued in an ongoing attempted murder investigation, authorized the search of the premises and Washington's person for any firearms, firearm-related evidence and

1   Washington's DNA.  The thirty-page warrant and supporting affidavit made no mention of

2   Rollins, who happened to be an overnight guest on the night of the search.

3       Two teams of SFPD officers were tasked with the execution of the warrant.  A "tactical

4   team" secured the residence and its occupants, after which a "search team" gathered evidence.

5   Officer David Edgerson, a member of the tactical team, was initially staged behind the

6   apartment, charged with securing the perimeter of the residence against escape.  Several

7   minutes after the tactical team ordered the occupants of the apartment out, Officer Edgerson

8   relocated to the side of the building.  There, he first encountered defendant Rollins, who's

9   hands had been restrained behind his back with a zip tie by another member of the tactical

10  team.  Officer Edgerson frisked defendant, including his groin area, but didn't uncover any

11  weapons.

12      About ten minutes later, the residence itself was "deemed clear" by the tactical team, and

13  defendant, along with his grandmother and a third occupant, were moved back into the

14  apartment and seated on a couch in the living room, shoulder to shoulder, just a few feet from

15  the threshold of the apartment.  Defendant, still in zip ties, sat in the middle of the other two

16  detainees.  The man to his right, furthest from the front door, was also restrained with zip ties,

17  while his grandmother, to his left, was unrestrained.  A member of the tactical team stood

18  guard just a few feet away.  Officer Edgerson then exited the apartment and left the scene

19  altogether shortly thereafter.  George Washington remained outside, also restrained and under

20  watch.

21      Officer Erika Viola arrived on the scene sometime after defendant was moved to the

22  living room couch.  She was the assigned case agent for the second group of SFPD officers

23  involved in the execution of the warrant, the "search team."  Officer Viola's team was tasked

24  with the collection of evidence after the tactical team's initial sweep.  As the assigned case

25  agent,  Officer Viola was responsible for the seizure of evidence and officer safety during the

26  duration of the search.

27      Officer Viola spent the next twenty or so minutes at the threshold of the apartment, a few

28  feet away from defendant and the other occupants of the apartment.  Shortly after her arrival,

2

defendant's grandmother, who was not restrained, was asked to get a hold of a dog in the room. Officer Viola frisked her before allowing her to do so. Officer Viola briefly went upstairs to speak with members of the search team and stepped outside to call in a background check on defendant. Dispatch informed her that defendant was on probation or supervised release. She spent most of those twenty minutes, however, at or near the threshold of the apartment, discussing the search with other officers, looking through paperwork, and so forth.

About twenty minutes after her arrival, the tactical team "handed off" the premises to Officer Viola and the search team. George Washington, who had until then been in the yard, under the watch of tactical officers, was brought in by a member of the search team and made to sit on a second couch facing the other three detainees. Following the handoff, Officer Viola decided to frisk the detainees for weapons. She began with George Washington, and then moved on to defendant. She first patted down his left leg and removed a wallet from his pocket, believing that it may be a weapon. She then did the same to his right leg, before checking his waistline, and then moving on to his groin. While searching his groin, she felt a hard, metal object that she believed might be a firearm, and began to unbutton his low-hanging pants to remove the object. Defendant began to clench his legs and impede her search, causing several officers to intervene and physically restrain him. They eventually retrieved an unloaded Glock pistol from his groin.

*          *          *

Defendant now moves to suppress evidence obtained from his search and seizure, arguing that the frisk that led to the discovery of the pistol in his groin was unsupported by a reasonable belief that he may be armed and dangerous, and exceeded the narrow scope of the *Terry* "pat down." The argument was fully briefed, additional briefing was requested and received, the parties were afforded an initial opportunity to present oral argument, and the Court ordered an evidentiary hearing. Officers Edgerson and Viola were examined and crossed at that hearing, which was followed by another round of briefing and oral argument, and finally, this order. All factual statements in this order, wherever located, are intended as findings of fact.

3

**ANALYSIS**

The execution of a valid search warrant "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted. An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *United States v. Davis*, 530 F.3d 1069, 1080 (9th Cir. 2008) (cleaned up). Any *frisk* during that detention must be independently justified. The standard is as follows:

> Where an officer reasonably believes that "the persons with whom he is dealing may be armed and presently dangerous," the officer may conduct a frisk or "pat-down" search of that person. For a frisk to be valid, under this exception to the general rule requiring probable cause, the frisk must be both **(1) "justified at its inception,"** and **(2) "confined in scope"** to a "carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault" an officer. However, a frisk is not valid if it is a general exploratory search motivated out of a desire "to prevent the disappearance or destruction of evidence of crime."

*United States v. I.E.V.*, 705 F.3d 430, 432–33 (9th Cir. 2012) (citations omitted) (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 29-30 (1968). "Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or indeed, any search whatever for anything but weapons. The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." *Ybarra v. Illinois*, 444 U.S. 85, 94 (1979). The government bears the burden of justifying a *Terry* search. Defendant argues that Officer Viola's search failed both prongs above. Each is addressed in turn.

1.   **REASONABLE BELIEF THAT DEFENDANT MAY HAVE BEEN ARMED AND PRESENTLY DANGEROUS.**

Defendant argues that the government cannot meet its burden because, even if there was reasonable suspicion to justify a *first* frisk, that frisk's failure to turn up any weapons dissipated any reasonable suspicion the police once had, rendering Officer Viola's second frisk improper. He provides several multiple-frisk decisions where an earlier frisk was held to foreclose on a later one. The government responds in kind with decisions where the totality of the circumstances justified multiple frisks of a detainee.

Defendant's *actual* argument, summed up in a supplemental filing, is distinguishable from the caselaw concerning multiple frisks:

> [I]t is *presumed* that Officer Viola *had to have been aware* that Mr. Rollins had received at least one prior pat down prior to her frisk of Mr. Rollins as the San Francisco Police Department's tactical team had arrived prior to her arrival. Officer Viola was aware that the tactical team had been there, had opportunity to confirm that the residence was secured — communicating there was no risk inside, and she could see that officers had placed plastic hand restraints on Mr. Rollins.

(Dkt. No. 64 at 2).

In every decision cited by the parties, the officer conducting the frisk under scrutiny (1) conducted the prior frisk(s), (2) was present for the prior frisk(s), or (3) had been made aware of the prior frisk(s) by the officer(s) that *did* conduct them. In no instance was an officer required to *presume* that a prior frisk had taken place, and therefore barred from frisking a detainee. That comports with *Terry*, which held that an officer is entitled to conduct a frisk of the "the persons with whom he is dealing . . . where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety." *Terry*, 392 U.S. at 30.

Here, Officer Viola was not personally aware of Officer Edgerson's prior frisk. Defendant's argument — that she must *presume* that defendant had been frisked because of the tactical team's representation that the scene was generally "secure" and because he was in hand restraints — fails.

As an initial matter, hand restraints are not a reliable indicator of a prior frisk. As Officer Edgerson noted on cross examination:

> **Q.** All right. You don't know who put the FlexiCuffs [plastic hand restraints] on him?
>
> **A.** I do not, no.
>
> **Q.** And you don't know if they performed a search on Mr. Rollins before they put the FlexiCuffs on him?
>
> **A.** No.
>
> **Q.** *Is it your pattern or practice to perform a pat search on someone before they put FlexiCuffs on them?*
>
> **A.** *No.*
>
> **Q.** *Have you put -- have you ever performed a search on someone before you put FlexiCuffs on them?*
>
> **A.** *It depends on the circumstance.*
>
> **Q.** Okay. But have you ever done that?
>
> **A.** Yes.

(Dkt. No. 75 at 28-29).

Officer Viola's testimony further underscores the point:

> **Q.** As part of your pattern and practice, when you put FlexiCuffs on an individual, do you perform a pat search on them?
>
> **A.** Yes, I do.
>
> **Q.** You don't know if other officers do that at all times, though?
>
> **A.** No.
>
> **Q.** But you don't know that officers do not perform a pat search on them?
>
> **A.** I do not know.

(Dkt. No. 75 at 56).

Defendant next suggests that Officer Viola should have known about the prior frisk because George Washington informed her that *he* had already been frisked when she decided

6

to do so herself. As an initial matter, Officer Viola is not required to trust the word of the target of an ongoing attempted murder investigation. Moreover, Officer Viola was well aware that George Washington was the actual target of her investigation, and that he had, until just moments before, been kept segregated from the other occupants of the apartment. Both those facts undermine the argument that a frisk of Washington evidenced a frisk of defendant Rollins.

To require an officer to *presume* that a sufficient frisk of a detainee occurred based on little more than another team's representation that the scene of an ongoing investigation is generally "secure" goes too far.

This order instead considers everything that Officer Viola *did* know at the time she frisked defendant. She knew that the warrant being executed sought, among other things, firearms believed to have been used in an attempted murder by George Washington, who is affiliated with a street gang. She was also aware that defendant was on probation or supervised release, but did not have any knowledge of a search condition. Immediately before the frisk, defendant was seated on a large couch, flanked on the right by an older man, and on the left, by his grandmother. The latter's hands were not restrained, and she had earlier been allowed to move around the cluttered living room in order to restrain a dog. Much of her body was covered by a mylar blanket. Given the cramped circumstances, defendant or those near him may have been able to access weapons despite their restraints.

Cutting the other way, defendant's hands were already restrained by zip ties, and the tactical team had represented to Officer Viola that the scene was, as a general matter, secure. Defendant was sitting still on the couch just before he was frisked and appeared to be cordial with all of the officers on the scene. Moreover, Officer Viola had articulated no particularized facts suggesting that defendant was armed and presently dangerous, beyond the fact that he was then on parole or supervised release: No bulge or other visual cues, no fidgeting, jerking, limping, or other suspect behavior, no hostile, agitated, or evasive statement from defendant, and no other indicator that he presented a risk. While the frisk took place after the tactical team handed off the scene to the search team, the tactical officer watching over the detainees

7

told Officer Viola that he would "chill" next to her as she began her frisks. Two tactical officers were among those that eventually restrained defendant, in addition to the search team. All told, the officers present, tactical and not, outnumbered the individuals being detained. Finally, Officer Viola frisked defendant over twenty minutes after she arrived on the scene. While there, Officer Viola checked her phone, flipped through forms, checked her watch, turned her back to defendant to speak to others, and behaved, generally, in a manner that does not suggest that she believed defendant to be "armed and *presently* dangerous." She frisked defendant's grandmother, seated next to defendant, just a few minutes after she arrived, but did not pat down defendant at that time.

Taken together, the facts supported a reasonable belief that defendant might have been armed and dangerous.

Defendant counters that his presence at the scene of the search does not give rise to a reasonable suspicion that he was armed and presently dangerous, citing *Ybarra v. Illinois*. 444 U.S. 85 (1979). In *Ybarra*, police executed a search warrant for narcotics directed to the bartender of a public tavern. Upon entering the tavern, police conducted a "cursory search for weapons" of every customer present and recovered tinfoil packets containing heroin from the appellant's pocket. *Ybarra* held that the frisk of the appellant "was simply not supported by a reasonable belief that he was armed and presently dangerous," because police did not have "any particular reason to believe that he might be inclined to assault them." *Id*. at 93. *Ybarra* is inapposite. As our court of appeals has explained:

> Unlike the defendant in *Ybarra,* the frisk of [defendant] did not occur in a public place to which he was not connected. Common sense suggests that there is a much greater likelihood that a person found in a small private residence containing drugs will be involved in the drug activity occurring there than an individual who happens to be in a public tavern where the bartender is suspected of possessing drugs.

*United States v. Davis*, 530 F.3d 1069, 1082 (9th Cir. 2008) (internal quotation marks omitted). Here, too, the frisk occurred in a private apartment where defendant was an overnight guest. The warrant at issue, meanwhile, sought weapons, not narcotics, further contributing to Officer

8

Viola's belief that the occupants of the apartment might be armed and presently dangerous. Finally, Officer Viola was aware that defendant was subject to probation or supervised release, while the police in *Ybarra* did not "recognize[ ] [appellant] as a person with a criminal history." *Ybarra*, 444 U.S. at 93.

### 2. SCOPE OF THE SEARCH.

A protective search "must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby. If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (citations and internal quotation marks omitted). Officer Viola's pat down of defendant did not exceed the scope of *Terry*. She patted down his legs, removed a wallet from his pocket that she believed may have been a weapon, checked his waistline, and, after checking his groin area over the outside of his pants, felt a "hard metal object" that she believed to be a firearm (Dkt. No. 75 at 50). She then moved to unbutton his pants in order to retrieve that object. Defendant began to resist and was restrained by several officers, after which a pistol was retrieved from his groin.

*First*, defendant argues that Officer Viola violated the narrow scope of the *Terry* frisk when she removed his wallet from his front left pocket. Not so. In *United States v. Hartz*, an officer frisked a detainee and "felt three items: an Altoids tin, containing prescription pills without a prescription; a marijuana pipe, made of a brass pipe fitting and plastic tubing; and golf-ball-sized cellophane bundle wrapped in duct tape." 458 F.3d 1011, 1018 (9th Cir. 2006). Our court of appeals deemed the removal of those items from the detainee's pockets within the scope of a *Terry* frisk based on the officer's testimony that "he thought each of these items could be, or could conceal, a weapon." *Ibid*. Here, too, Officer Viola testified that she was "unsure it [the wallet] was a weapon or not," justifying her removal of the wallet from defendant's pocket (Dkt. No. 75 at 63).

*Second*, defendant argues that Officer Viola violated the limited scope of the *Terry* frisk when she "manipulated" his groin (Dkt. No. 76 at 3). Officer Viola testified that she

1  "manipulated the front groin area of Ricky Rollins, and I couldn't — I felt a hard metal object.
2  I manipulated further, and I believed it to be a firearm" (Dkt. No. 75 at 49). Defendant argues
3  that Officer Viola exceeded the scope of *Terry* because she manipulated his groin *before*
4  detecting an object that she believed to be a weapon, citing to *Dickerson*. There, the searching
5  officer determined that a lump in the detainee's pocket "was contraband only after squeezing,
6  sliding and otherwise manipulating the contents of the defendant's pocket – *a pocket which the*
7  *officer already knew contained no weapon*." 508 U.S. at 378 (internal quotation marks
8  omitted, emphasis added). The Supreme Court held that "the officer's continued exploration of
9  respondent's pocket *after having concluded that it contained no weapon* was unrelated to the
10 sole justification of the search under *Terry*: the protection of the police officer and others
11 nearby." *Ibid.* (cleaned up, emphasis added).

12 Officer Viola did not determine that there was *no* weapon in defendant's groin only to
13 continue squeezing, sliding, and manipulating in hopes of uncovering *evidence*. She
14 manipulated a body part *to facilitate her search of defendant's outer clothing for weapons*, felt
15 what she believed to *be* a weapon, and then took steps necessary to remove that weapon from
16 defendant's groin. That process became physical and necessitated the exposure of defendant's
17 buttocks due to his resistance to the officers' attempt to remove the pistol lodged in his groin.
18 Yes, the groin is a private area, but Officer Viola's "manipulation" of defendant's body was no
19 different than an officer's parting of a detainee's legs or lifting of their arms to facilitate a frisk,
20 and was, like those manipulations of a detainee's body, intended to facilitate a pat down for
21 weapons.

22                              *         *         *

23 Finally, the fact that Officer Viola, a female officer, conducted a *Terry* frisk of defendant,
24 a male, does not move the needle. *Lee v. Downs*, cited by defendant, illustrates why. 641 F.2d
25 1117 (4th Cir. 1981). In that Section 1983 litigation, male prison guards held down a female
26 prisoner while she was stripped of her undergarments by a female nurse, and, in a separate
27 incident, held her down again while that nurse conducted a cavity search of the nude prisoner.
28 Here, the intrusion upon defendant was far more limited. Officer Viola conducted a pat down

10

over defendant's clothing.  She did not undress defendant or move beyond his outer clothing until *after* she felt something that she suspected to be a weapon (Dkt. No. 75 at 49).  An officer's frisk of an adult of the opposite sex is not unreasonable.

## CONCLUSION

Defendant's motion to suppress is **DENIED**.

**IT IS SO ORDERED.**

Dated:  October 28, 2024.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE